Filed 4/21/25  Hazelle H. v. Superior Court CA1/5
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

|  |  |
| --- | --- |
| HAZELLE H., Petitioner, v. THE SUPERIOR COURT OF THE CITY AND COUNTY OF SAN FRANCISCO, Respondent; SAN FRANCISCO HUMAN SERVICES AGENCY, Real Party in Interest. | A172410 (City & County of San Francisco Super. Ct. Nos. JD23-3265, JD23-3265A) |

Hazelle H., mother of four-year-old twins Autumn W. and Wynter W.,[1] petitions for extraordinary writ relief after the juvenile court, at the 12-month review hearing, terminated reunification services and set this dependency matter for a permanent placement hearing pursuant to Welfare

---

[1] Hazelle H. is also the mother of 11-year-old Laylani J.  Mother filed a separate writ petition challenging the termination of reunification services and the setting of a Welfare and Institutions Code section 366.26 hearing regarding Laylani J.  In our unpublished opinion filed concurrently herewith, we deny mother's separate petition (*Hazelle H. v. Superior Court* (Apr. 21, 2025, A172406)).

and Institutions Code section 366.26.[2]  Mother contends the juvenile court erred in finding that returning the children to mother would create a substantial risk of detriment to the children's safety, protection, or physical or emotional well-being.  Mother also contends that the juvenile court erred in finding that reasonable services were provided to mother.  She requests that we reverse the order and remand with instructions to return the children to mother or, in the alternative, provide mother with an additional six months of reunification services.  She also requests an immediate stay of the section 366.26 hearing scheduled for May 14, 2025.  We conclude substantial evidence supports the juvenile court's findings.  We deny the writ petition and request for a stay.

**FACTUAL AND PROCEDURAL BACKGROUND**

On August 31, 2023, the San Francisco Human Services Agency (Agency) filed a section 300 petition alleging that then three-year-old twins Autumn and Wynter, along with their then nine-year-old half sibling Laylani, came within the jurisdiction of the juvenile court due to domestic violence between mother and Brian W., mother's partner of nine years and the father of the twins.  We incorporate by reference the factual and procedural background in our concurrently filed opinion (*Hazelle H. v. Superior Court, supra*, A172406) and provide additional background information *post* regarding the twins.

On August 29, 2023, the day of the domestic violence incident that led to the filing of the petition, the twins were in the bedroom with Laylani when mother and Brian W. began fighting in the hallway.  Laylani reported that all three children have been present when Brian W. choked mother.  All three children were afraid, and Wynter cried every time there was yelling at home.

---

[2] All statutory references are to the Welfare and Institutions Code.

The twins were initially placed with their maternal aunt Joellyn B. Another maternal aunt, Sabrina H., assisted with caregiving while Joellyn B. was at work. The maternal aunts reported that the twins had limited speech, which they believed was due to watching too much television and not attending school.

Mother's visitation initially was supervised on weekend afternoons at Sabrina H.'s home. As of the Agency's October 19, 2023, disposition report, mother was not consistently visiting the twins for the minimum of six hours a week, or more. Mother presented as tearful, angry, and frustrated, and her interactions with Sabrina H. were turbulent. At a supervised visit on October 13, 2023, mother cursed at Sabrina H. in front of the twins. Mother missed one visit because it was raining and she did not want to take public transportation. The social worker told mother that the Agency and the court expected parents to prioritize their children over the inconveniences of weather and public transit.

The Agency referred the twins to the Regional Center of the East Bay for assessments to address their language delay and their lack of boundaries based on their maternal aunt's report that they do not display " 'stranger danger' " when they meet new people or at the park. The Agency's May 14, 2024, status review report stated that Autumn was previously diagnosed with autism spectrum disorder and developmentally delayed cognition, based on prior medical records. Mother told the social worker that she understood Autumn's doctor mentioned the possibility of autism, but she did not know that Autumn was diagnosed until the social worker received the medical documentation. The twins enrolled in a family day care setting, and the maternal aunts practiced speech with the children. The maternal aunts reported that the twins were making positive strides in their behavior. The

3

twins and Laylani remained placed with Joellyn B.; however, because Joellyn B. also had other children in her care, the Agency assessed Sabrina H.'s home as a placement for the twins.

Mother's supervised visits with the twins were described as "high energy." At times, mother struggled to intervene to curb some of their behaviors, such as throwing objects, hitting, and running off. Autumn was observed " 'running away' " inside the visitation center. Mother was affectionate with the children, and over time they established a positive routine at the visitation center.

As of June 2024, mother told the social worker that she continued to speak on the phone with Brian W. from time to time. The Agency remained concerned that if the children were returned, mother would allow Brian W. to have in-person visits in the home and risk exposing them to additional domestic violence. However, the Agency exercised its discretion to allow mother unsupervised overnight visits with the twins under an agreed-to safety plan involving mother, Laylani, mother's sisters, and other family members. The relatives were to check in with mother during the visits by video calls or in person. They all agreed to report if mother had any contact with Brian W. The plan was for mother to have two safe and successful overnight visits with the twins at mother's home followed by an extended home visit, after which the Agency hoped to be able to recommend returning the twins to mother's care.

The Agency's August 8, 2024, addendum report stated mother canceled two planned overnight visits with the twins in early July. The social worker met with mother on July 11, 2024, in advance of the planned overnight visit the following day. The social worker gave mother funds for diapers and food for the visit and arranged for transportation. The next day, the social worker

4

was informed by the transportation service that mother was canceling the visit. Mother reportedly was crying and upset. The social worker reached out to mother to investigate; however, mother did not answer the phone. The following week mother texted the social worker that she would not be able to visit Laylani that week, but she rescheduled an overnight visit with the twins for July 19th. Laylani then agreed to come to the overnight visit with the twins, and the social worker arranged for transportation for the three children.

After Laylani reported that Brian W. came to mother's home for a brief period of time during the overnight visit, the Agency paused visitation and investigated. When the social worker asked mother about Brian W.'s presence in the home, mother yelled, blamed Laylani for reporting, and said she had to calm down before she could talk further. As of the August 8, 2024 addendum report, mother had not responded to the social worker's follow-up phone and text messages.

The Agency's October 9, 2024, status review report stated that following the July overnight visit, the social worker made multiple attempts to contact mother. Mother did not respond to the social worker's messages until the last week of August. During this period, mother stopped attending domestic violence counseling sessions and did not attend individual therapy. In mid-August, the domestic violence counselor planned to close mother's case due to the lack of contact. The social worker advocated for the provider to keep the case open and encouraged mother to reengage with domestic violence counseling. The social worker also encouraged mother to reengage in individual therapy. Mother acknowledged recent telephone contact with Brian W. She said she had been trying to decrease communication, but she occasionally responded when he reached out. The Agency reported concern

5

that mother was reliant on Brian W. because of her lack of resources after losing her job. Mother's ongoing contact with Brian W., despite the restraining order, caused the Agency concern that mother would again allow Brian W. in the presence of the children.

Regarding visitation with the twins, the Agency's October 9, 2024 status report stated that mother consistently visited on weekend afternoons with Sabrina H. supervising. During visits mother assumed all parenting duties for the twins and supervised them appropriately. However, Sabrina H. occasionally had to step in to help because the twins had a lot of energy. At the end of the visits, the twins tended to become upset.

The Agency's January 29, 2025 addendum report stated mother's visitation with the twins was inconsistent during the reporting period. Mother missed two visits in December and two in January. The visits were temporarily suspended and then reinstated after mother met with the social worker in mid-January. Sabrina H., who supervised the visits that did occur, reported positive interactions between mother and the twins. However, Sabrina H. drove the twins to visits or provided gas money for mother to ensure the visits happened. This caused strain on the relationship between mother and Sabrina H., and the Agency arranged to move the visits back to a visitation center.

Both twins were diagnosed with autism and were in the eighth percentile or below in "communication, cognitive, adaptive behavior, social–emotional, physical, and overall general development." Sabrina H. enrolled the twins in prekindergarten and arranged for them to obtain services to support their behavioral development.

Mother reported to the Agency that her last contact with Brian W. was in October 2024. However, the Agency continued to receive reports from

6

family members that mother was still communicating with Brian W. The Agency further reported that based on its discussions with mother it believed she did not understand the negative impact her contact with Brian W. had on the children. Given the twins' developmental delays, the Agency was concerned that if the twins returned to mother's care, they would not be able to adequately communicate Brian W.'s presence in mother's home. Mother had not demonstrated behavioral change or a plan to ensure her children were protected from the emotional and physical harm caused by exposure to domestic violence.

At the 12-month hearing, the social worker testified that mother continued to have contact with Brian W. even after the July overnight visit incident and mother minimized the trauma caused by allowing Brian W. to be in the presence of the children. The social worker was concerned that mother would not report if Brian W. was present in the home because she had not done so in the past, and given the twins' age and developmental delays, they also would not be able to communicate any future domestic violence incidents. The social worker testified that if mother refrained from contact with Brian W. for an extended period, then it would be safe to return the twins to mother's care. Mother told the social worker her last contact with Brian W. was in October 2024. The social worker acknowledged that she could not prove mother and Brian W. were still in contact, but she was concerned based on the history of the in-person contact during two overnight visits and mother's continuing contact for months following the July overnight visit. The social worker also explained her overriding concern that mother would not be able to protect the children from exposure to Brian W.

The social worker suggested that mother consider moving to a new location and change her phone number so Brian W. could not reach her.

7

Mother changed her phone number, but then she gave Brian W. the new number. In October 2024, during a call between the social worker, Sabrina H., and mother, Sabrina H. offered to have mother live with her and mother refused, stating, "[W]hat does that look like for [me] to be a grown woman and move in with someone else." Given mother's prior refusal to move, the social worker's recommendation to terminate reunification services was not changed based on email correspondence dated January 28, 2025, and January 22, 2025, from the twins' maternal grandmother and the maternal great-aunt stating that mother could live with them. Further, the social worker spoke with both the relatives and testified that the great-aunt's home was not suitable for mother and the twins because mother's aunt lived in a two-bedroom apartment with a live-in caregiver. The maternal grandmother had a child welfare history precluding her from being alone with the children.

The juvenile court found the Agency established that returning the children to mother's care would create a substantial risk of detriment and that mother received reasonable reunification services. It acknowledged mother's testimony that she ceased communications with Brian W. However, it found that mother did not appreciate the cycle of domestic violence. It explained mother "violated the restraining order, prioritiz[ed] her relationship with [Brian W.] over her daughters, minimiz[ed] the traumatic effect of her engagement with [Brian W.] on her child, [and] she . . . put[] her children at current risk of future violence because she doesn't understand the danger that [Brian W.] presents. She hasn't identified ways to prevent future violence from happening either with [Brian W.] or any future relationship."

## DISCUSSION

**I.** *Substantial Risk of Detriment*

At the 12-month review hearing, the juvenile court "shall order return of the child to the physical custody of their parent . . . unless the court finds, by a preponderance of the evidence, that the return of the child to their parent . . . would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child." (§ 366.21, subd. (f)(1).) We review the juvenile court's finding for substantial evidence to determine whether evidence, contradicted or uncontradicted, supports the court's determination. (*Georgeanne G. v. Superior Court* (2020) 53 Cal.App.5th 856, 864–865.) We resolve evidentiary conflicts in support of the juvenile court's determination and indulge all legitimate inferences in favor of the findings. (*Id.* at p. 865.) We review the record in the light most favorable to the juvenile court's determinations, do not reweigh the evidence, and defer to the juvenile court's credibility determinations. (*In re I.J.* (2013) 56 Cal.4th 766, 773.)

Mother argues that the juvenile court erred in finding detriment because there was a lack of evidence of any domestic violence between mother and Brian W. since the August 2023 incident and a lack of evidence of any contact between them since August 2024. She contends the Agency's concerns of future domestic violence and contact between mother and Brian W. are based on speculation. She also refers to email correspondence sent to mother's counsel in late January 2025 from mother's sister Christina G. and the maternal grandmother, stating that mother was no longer in contact with Brian W.[3]

---

[3] The email correspondence was admitted into evidence. The email correspondence also disputed a report made by Joellyn B. to the social worker

9

We find substantial evidence supports the juvenile court's detriment finding. First, mother's testimony about when she ended her relationship with Brian W. was inconsistent and contrary to other evidence. She testified that she ended the relationship when the petition was filed in August 2023 but then acknowledged that she invited him to the February 2024 overnight visit. Later, mother said she actually ended the relationship in August 2024. The Agency reported, both in its written report and through the social worker's testimony, that mother acknowledged communication with Brian W. through October 2024. The restraining order was in effect the entire time mother was continuing contact with Brian W.

Moreover, there is evidence throughout the case that mother was not honest or forthcoming with the Agency about either past incidents of domestic violence or continued contact with Brian W. She initially denied that Brian W. was at the February 2024 overnight visit after Laylani reported it, and she blamed Laylani for doing so. In order to protect the children and work toward possible reunification, the Agency developed a safety plan with mother and her relatives prior to the July 2024 overnight visit that required mother to report any contact with Brian W. and observe the terms of the restraining order. Instead, it was Laylani who reported Brian W.'s presence during the July overnight visit, and when the Agency attempted to speak with mother about the incident, mother yelled, blamed Laylani again, and refused to talk to the Agency for over a month. During this time, mother disengaged from both her domestic violence counseling and her individual therapy. Although she eventually resumed domestic violence

---

that mother and Brian W. were together in October 2024 with Christina G. The social worker's notes identify mother's other sister as "Chrystal," rather than Christina G., which appears to be an error, as mother does not have a sister named Chrystal.

10

counseling, she reported that she was not getting much out of it but then declined to participate in an alternative program. The Agency reported that as of January 2025, mother lacked an understanding of the negative impact her contact with Brian W. had on her children and did not have a plan to ensure her children were protected from the negative effects of exposure to domestic violence. Further, the social worker testified to her concern that the twins, who have speech delays and autism diagnoses, would not be able to communicate future domestic violence incidents.

Based on the totality of the record, we find substantial evidence supports the juvenile court's finding that returning the twins to mother's care would create a substantial risk of detriment to them. As the juvenile court explained, throughout the dependency proceeding mother violated the restraining order, prioritized her relationship with Brian W. over her daughters, minimized the trauma caused to her daughters, and risked exposing her children to future violence because she failed to understand the danger posed by Brian W. The juvenile court also considered that the twins' young age and speech delays increased the risk of physical and emotional harm because they could not advocate for themselves. We recognize there is also evidence that mother made some progress in addressing the domestic violence that brought her children to the attention of the Agency. However, a conflict in evidence does not support reversal of the juvenile court's detriment finding. (*In re L.Y.L.* (2002) 101 Cal.App.4th 942, 947.)

## II. *Reasonable Reunification Services*

Mother argues substantial evidence does not support the juvenile court's finding that the Agency provided mother with reasonable reunification services. She contends that reasonable services were not provided because the Agency did not revert to unsupervised visitation during

11

the last reporting period. Mother asserts that visitation should not have returned to supervised after the July 2024 overnight visit because although Brian W. appeared at mother's home during the visit, she asked him to leave and he did so. According to mother, the Agency should have recognized mother's actions as a step toward establishing boundaries with Brian W. Mother's position ignores that she violated the safety plan by failing to report Brian W.'s presence to the Agency, blamed Laylani when she learned Laylani reported, and then stopped communicating with the Agency for over one month. Moreover, nothing in the record demonstrates mother raised this argument at the six-month review hearing held on August 8, 2024, when the juvenile court adopted the Agency's recommendation to provide supervised visitation. We agree with the Agency that mother forfeited the argument that it was error to order supervised visitation after the July 2024 overnight visit. (*In re Anthony P.* (1995) 39 Cal.App.4th 635, 640–642.)

Mother further argues that even assuming it was proper to revert visitation back to supervised immediately after the July overnight visit, the Agency should have exercised its discretion to return to unsupervised visitation "within a few weeks . . . ." Again, mother ignores the facts that she was out of contact with the Agency for over a month after the July overnight visit and that during this time she disengaged from individual therapy and domestic violence counseling. The " 'adequacy of reunification plans and the reasonableness of the [Agency's] efforts are judged according to the circumstances of each case.' [Citation.] To support a finding reasonable services were offered or provided, 'the record should show that the supervising agency identified the problems leading to the loss of custody, offered services designed to remedy those problems, maintained *reasonable* contact with the parents during the course of the service plan, and made

12

*reasonable* efforts to assist the parents in areas where compliance proved difficult . . . .' " (*Tracy J. v. Superior Court* (2012) 202 Cal.App.4th 1415, 1426.) "In almost all cases it will be true that more services could have been provided more frequently and that the services provided were imperfect. The standard is not whether the services provided were the best that might be provided in an ideal world, but whether the services were reasonable under the circumstances." (*In re Misako R.* (1991) 2 Cal.App.4th 538, 547.)

Under the circumstances of this case, substantial evidence supports the juvenile court's finding that the Agency provided mother with reasonable services, including appropriate supervised visitation with the twins after mother twice failed to avoid interaction with Brian W. during unsupervised overnight visitation. It was reasonable for the Agency to decline to return to unsupervised visitation during the last reporting period after mother would not talk to the Agency social worker about the incident at the overnight visit for over a month, blamed Laylani for reporting the incident, and disengaged from domestic violence counseling and individual therapy. When the Agency attempted to arrange for mother to resume individual therapy, mother declined the opportunity. Although mother did resume domestic violence counseling during the last reporting period, she told the social worker she did not feel that she was getting much out of it. When the Agency suggested an alternative program, mother complained that the Agency was giving her an excessive number of things to do. Under these circumstances, the Agency's decision not to exercise its discretion to liberalize visitation to unsupervised for a third time was reasonable and did not render the reunification services inadequate.

13

## DISPOSITION

The petition for extraordinary writ is denied on the merits. (§ 366.26, subd. (*l*)(1)(c); Cal. Rules of Court, rule 8.452.) The request for a stay is denied. Our decision is final as to this court immediately. (Cal. Rules of Court, rule 8.490(b)(2)(A).)


Jackson, P. J.

WE CONCUR:

Simons, J.
Burns, J.

A172410/*Hazelle H. v. Superior Court (S.F. Human Services Agency)*

14